IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,                      )
                                               )
            Plaintiff,                         )
vs.                                            )        No.  CIV 06-0933 RB/RHS
                                               )
99,223.7238 ACRES OF LAND, more or less, in    )
SANDOVAL and RIO ARRIBA COUNTIES,              )
NEW MEXICO, and J.B. HARRELL, JR., et al.      )
                                               )
            Defendants.                        )

<u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiff's Combined Motion and Memorandum

of Law for Preliminary Legal Determinations Regarding the Laws Governing Development of the

Condemned Geothermal Resource (Doc. 24), filed February 23, 2007, and Defendants' Motion for

Preliminary Determinations (Doc. 39), filed July 2, 2007.  Jurisdiction arises under 28 U.S.C. §

1331.

        This condemnation action concerns the undivided mineral estate beneath the Valles Caldera

National Preserve.  The questions presented are preliminary determinations, which the parties

maintain, are necessary to determine the "just compensation" the government owes for the "taking"

at issue.  Having considered the submissions, applicable law, and being otherwise fully advised, I

hereby **grant** Plaintiff's motion, and **grant in part and deny in part** Defendant's motion, as stated

herein.

**I.      Background.**

        The Valles Caldera National Preserve ("the Preserve"), located in New Mexico's Jemez

Mountains, is surrounded by the Santa Fe National Forest.  The Preserve accounts for "most of the

Valles Caldera," a "large resurgent lava dome with potential geothermal activity." 16 U.S.C. § 698v(a)(1)-(2). Prior to the date of the taking at issue here, the government owned 100% of the Preserve's surface estate and 87.5% of the underlying undivided mineral subsurface estate. On May 21, 2006, the government exercised eminent domain authority over the outstanding 12.5% minority mineral interests.

Notably, the area that constitutes the Valles Caldera National Preserve ("the Preserve") today was previously known as Baca Ranch. (Pl.'s Mot. 2.) Despite being "surrounded on all sides by federal land," Baca Ranch remained privately owned "[f]rom its inception as a land grant in 1860" until 2000. (Pl.'s Mot. 3; Pl.'s Mot. Ex. 1 (map of the Santa Fe National Forest).) Plaintiff acquired it in 2000 from the James Patrick Dunigan family. (Pl.'s Mot. 3) At that time, the Dunigan family owned Baca Ranch's entire surface estate and seven-eighths - 87.5% - of its undivided mineral estate. (Defs.' Mot. 2; Pl.'s Reply 2.) The remaining one-eighth - 12.5% - of the subsurface estate was owned by a number of private individuals. (Defs.' Mot. Ex. B (Letter from Jack L. Craven, U.S. Forest Service, Director of Lands, to J.B. Harrell, Jr. of 12/18/2001) (listing the minority mineral owners and their respective fractional minority interests).)

## A.   The geothermal resource at issue.

A recognized geothermal resource lies beneath the Valles Caldera.[1] (Pl.'s Mot. Ex. 2 (U.S.

---

[1]The New Mexico Energy and Minerals Department, Oil Conservation Division defines geothermal resources as:

> the natural heat of the earth or the energy, in whatever form, below the surface of the earth present in, resulting from, created by, or which may be extracted from, this natural heat, and all minerals in solution or other products obtained from naturally heated fluids, brines, associated gases and steam, in whatever form, found below the surface of the earth, but excluding oil, hydrocarbon gas and other hydrocarbon substances.

N.M. Code R. § 19.14.1(O) (Weil 2007). *Accord Alba v. Peoples Energy Res. Corp.*, 94 P.3d 822, 828 (N.M. Ct. App. 2004) ("Geothermal energy is understood to mean the natural heat of the earth which can be extracted in the form of hot water and/or water vapor . . . . [it] consists of heat and pressure [and is] used to produce energy . . ." (internal quotation marks and additional citations omitted)); *see generally Rosette Inc. v. United States*, 277 F.3d 1222, 1228 (10th Cir. 2002) (concluding that "the geothermal process as a whole is inorganic" and, thus, under the

Forest Service, *Report on the Study of the Baca Location No. 1*) (existence of a geothermal resource beneath the Valles Caldera surface first suspected in 1960).)  Development of this geothermal resource:

> [began in 1978 when] approximately twenty geothermal wells were drilled on land . . . . Apart from these wells, no further geothermal development occurred, and the project terminated in 1984.  Since then, there has been no further development of this geothermal resource.

(Pl.'s Mot. 4-5 (citations to record omitted); *id*. Ex. 2 (development ceased because of "uncertainty over how easily the geothermal reservoir could be tapped").)

On or about March 6, 2000, the minority interest owners leased their combined 12.5% interest to GeoProducts of New Mexico, Inc. ("GeoProducts"). (Pl.'s Mot. Ex. 5 (*GeoProducts of N.M., Inc. v. Valles Caldera Trust*, CIV 05-0394 MV/ACT, Mem. Op. & Order (D.N.M. Mar. 24, 2006)).)  Although GeoProducts' lease entitled it to, *inter alia*, "explore for and develop geothermal energy" "in, on, through, and under . . . Baca Ranch," to date, it has not succeeded in exercising those rights.[2]  (Defs.' Mot. Ex. C.)

**B.      The Valles Caldera Act of 2000.**

On July 25, 2000, the Valles Caldera Preservation Act ("VCPA" or "the Act") became law. 146 Cong. Rec. D834-01 (daily ed. July 26, 2000).  The Act authorized Plaintiff ("United States of America") to acquire, on a "willing seller basis," "all or part of the rights, title, and interest in and to approximately 94,761 acres of the Baca ranch."  16 U.S.C. § 698v-2(a)(1), (a)(3)(A) (2000).  The Act thus established the Preserve.  Therein, it expressly provided that the Preserve was a unit of the

---

Stock Raising Homestead Act of 1916, "may be classified as generally mineral in character").

[2]By the lease terms, GeoProducts also "agree[d] to conduct all of its operations [under the lease] in accordance with . . . the laws of the State of New Mexico."  (Defs.' Mot. Ex. C.)  For present purposes, it is significant that the lease makes no reference to the applicability, or inapplicability, of federal law.  (*Id*.)

National Forest System.  16 U.S.C. §§ 698v-3, 698v-6(f).   The VCPA's stated purposes include "protect[ing] and preserv[ing] the scientific, scenic, geologic, watershed, fish, wildlife, historic, cultural, and recreational values of the Preserve," and "provid[ing] for multiple use and sustained yield of renewable resources within the Preserve."  *Id*. § 698v-3(b).

Under the VCPA, the Valles Caldera Trust ("the Trust") - created as a government corporation - and the Secretary of Agriculture are vested with responsibility for managing the Preserve and its resources.  *Id*. §§ 698v-4–698v-6.  Notably, the VCPA made clear that:

> The acquisition of the Baca ranch by the Secretary shall be *subject to* all outstanding valid existing mineral interests. The Secretary is authorized and directed to negotiate with the owners of any fractional interest in the subsurface estate for the acquisition of such fractional interest on a willing seller basis for not to exceed its fair market value, as determined by appraisal done in conformity with the Uniform Appraisal Standards for Federal Land Acquisitions . . . .

16 U.S.C. § 698v-2(e) (2000) (emphasis added).

### C.    Plaintiff's failure to acquire Defendants' interests on a willing-seller basis.

Following the VCPA's enactment, Plaintiff purchased Baca Ranch's entire "surface estate and 87.5% of [its] undivided mineral estate."  (Pl.'s Mot. 3.)  "The outstanding 12.5% of the mineral rights were not a part of the sale."  (Defs.' Mot. Ex. A (Valles Caldera National Trust, *Valles Caldera National Preserve: Framework and Strategic Guidance for Comprehensive Management*, (2003)).)

The Forest Service - pursuant to the VCPA and at the Secretary of Agriculture's direction - engaged in negotiations with the owners of the outstanding mineral interests and their lessee, GeoProducts (collectively, "Defendants") to acquire their minority interests.  Therein, the agency "commissioned, reviewed and approved an appraisal of Defendants' mineral interests":

> By mutual agreement between the Forest Service and the Harrells [acting as representatives "of all the minority mineral owners, except for Mr. Bubba Spears"],

4

the appraiser was instructed to appraise the entire mineral estate as though it were a single, consolidated ownership, even though the United States of America already own[ed] 87½% of those rights, while 12½% of the rights are outstanding. This appraisal was completed . . . and approved . . . as being in conformity with the Uniform Standards [for Federal Land Acquisitions] . . . .

  The appraiser determined that the value of 100% of the mineral estate [was] $15,000,000 . . . .

(Def.'s Mot. Ex. B (Letter from Jack L. Craven, Director of Lands, U.S. Forest Service, to J.B. Harrell, Jr. of 12/18/2001).)

Based on this appraisal, on December 18, 2001, the Forest Service made the following offer to purchase Defendants' mineral interests:

<u>Offer to Purchase</u>
  Subject to the limitations noted below, the Forest Service is offering to acquire all the rights of minority minerals owners commensurate with their pro rata share of the appraised price . . . as follows:

   $15,000,000.00 x 12.5% (Total Minority Interests) = $1,875,000.00 . . . .

<u>Limitations</u>:
  This offer is subject to the following -
  1. Each minority mineral owner will be required to convey all their rights, title and interest in and to the Baca Ranch . . . . to assure that there are no residual property rights remaining in the property after acquisition.
  2. All minority mineral owners and the lessee must agree to sell . . . .
  . . . .
  4. The conveyance will include all leasehold interests including that to GeoProducts of New Mexico, Inc. . . . .

(*Id*.)  Defendants rejected the Forest Service's $1.875 million offer.[3]  (Defs.' Mot. Ex. H (Letter from Jack L. Craven, Director of Lands, U.S. Forest Service, to J.B. Harrell, Jr. and Donald F. Harrell of 2/6/02) (noting that Defendants rejected offer by letter dated January 28, 2002).)

The Forest Service, thereafter broke off further negotiations.  In so doing, it asserted that any

---

   [3]The Forest Service's offer accounted for GeoProducts' lease, but the leasehold interest had only "limited effect" on the mineral estate's "fair market value."  (Defs.' Mot. Ex. B (asserting that GeoProducts' "assertions of value to that lease are not supportable under the Uniform Standards [for Federal Land Acquisitions]"); *but see* Defs.' Mot. 7 ("The Forest Service [offer] did not value GeoProducts' leasehold interests.").)

geothermal-resource development of Defendants' mineral interests would:

> require compliance with applicable Federal and state laws and regulations, just as it does for other owners who develop mineral interests on Federal land . . . . any surface occupancy must be conducted in accordance with an approved operating plan . . . .

(Defs.' Mot. Ex. H.)  The agency noted that it was " willing to work with [GeoProducts] in order to facilitate the preparation of a suitable operating plan." (*Id*.)  At the same time, however, the Trust made clear to GeoProducts that it "vigorously opposed" GeoProducts' efforts to "develop the preserve's geothermal assets." (*Id*. ("[T]hese plans profoundly conflict with its mission to preserve and protect the qualities of the Valles Caldera . . .").)

### D.    Defendants' efforts to develop the geothermal resource underlying the Preserve.

GeoProducts pursued development of the geothermal resource lying beneath the Preserve. These efforts included, in 2003, submitting Applications to Drill ("APDs") to the New Mexico Oil Conservation Commission ("NMOCC").  The APDs sought permission to "re-open existing geothermal wells on the Preserve." (Pl.'s Mot. 5.)

The NMOCC denied GeoProducts' APDs.  It reasoned that: (1) as a general matter, it lacks "jurisdiction to determine title or the rights of any party to occupy property"; (2) "both [GeoProducts and the Valles Caldera Trust] agree[d] that exploration c[ould] only begin after" the Forest Service deems GeoProducts' proposed use as a "reasonable use of the federally owned surface based on an operating plan submitted by GeoProducts"; (3) GeoProducts had "neither obtained nor applied for" such "surface use authorization" for the purpose of conducting the activities proposed in the APDs"; and (4) thus, "approval of APDs for re-entry of the subject wells . . . would be improvident" at that time.  (Pl.'s Mot. Ex. 3 (NMOCC decision of 2/12/04).)

Accordingly, GeoProducts submitted a surface- use plan to the Valles Caldera Trust.  (Defs.'

Mot. Exs. L, M.)  The Valles Caldera Trust responded, stating that: (1) "the well bores on the Preserve surface estate belong to the Valles Caldera Trust"; (2) they "cannot be used by GeoProducts"; and (3) the Trust "w[ould] continue to resist [GeoProducts'] efforts to attempt to use [them]."  (Defs.' Mot. Ex. N.)  In any event, the Trust stated that the surface use plan must be "submitted to the U.S. Forest Service."  (Defs.' Mot. Exs. L, M.)

GeoProducts then submitted its surface use plan to the Forest Service.  (Defs.' Mot. Ex. O.) The Forest Service responded, raising several issues with the plan.  Thereafter, GeoProducts submitted an amended plan.  (Defs.' Mot. Ex. P.)  The Forest Service acknowledged that the amended plan "responded satisfactorily" to its concerns.  (Defs.' Mot. Ex. S.)

Nevertheless, the agency informed GeoProducts that it could not recommend approval of GeoProducts' surface use plan.  (Defs.' Mot. Ex. S (Letter of 2/2/05 from M. Linden, Forest Service, Regional Geologist) ("I serve in an advisory role to the . . . Trust on the surface protection measures to be incorporated into this operating plan . . . . I wish to clarify that I am not in a position to deny or approve your client's proposed surface use plan.").)  Functionally, the surface use plan was denied.  (Defs.' Mot. Ex. R (noting that it was the Forest Service's understanding that the Trust's position was that it owned the well bores, by virtue of its ownership of the Preserve's surface,  and did not "intend to grant GeoProducts the right to use them"); *see also* Defs.' Mot. Ex. Q.) (*Compare* Defs.' Mot. Ex. S (stating that the Forest Service could not recommend approval of the plan), *and id*. (noting that the Forest Service could not "deny or approve" the plan), *with* Defs.' Mot. Ex. N (stating that the Trust was opposed GeoProducts' "efforts to attempt to use the existing well bores" on the Preserve), *and* Defs.' Mot. 10 ("[Plaintiff] contends that . . . Forest Service and/or the Valles Caldera Trust had the authority to approve a surface use plan for GeoProducts' proposed geothermal activities . . . .").)

7

As a result, GeoProducts sued the Trust. Seeking declaratory relief, GeoProducts argued that it "had the right" to use the existing geothermal wells "as part of its reasonable use of the [Preserve's] surface estate." *GeoProducts of N.M., Inc. v. Valles Caldera Trust*, No. 05-0394 MV/ACT (D.N.M. Mar. 24, 2006) (Mem. Op. & Order denying: (1) GeoProducts' summary judgment motion; and (2) the Trust's motion to dismiss for lack of jurisdiction, or in the alternative, for summary judgment). That lawsuit was, however, ultimately dismissed without prejudice. *See GeoProducts of N.M., Inc.*, No. 05-0394- MV/ACT (D.N.M. Mar. 30, 2007) (Mem. Op. & Order) (ruling that the United States' May 21, 2006 taking of the mineral interests leased by GeoProducts likely mooted "most, if not all, of the relief sought").

## E.     The Valles Caldera Act of 2005.

In December 2005, the VCPA was amended. Pub. L. 109-132, Dec. 20, 2005, 119 Stat. 2570. In applicable part, the amendments authorized Plaintiff to exercise eminent domain over the outstanding mineral interests if "negotiations to acquire the interests [we]re unsuccessful by the date that is 60 days after December 20, 2005." 16 U.S.C. § 698v-2(e)(5) (2005); *compare* Pub. L. 106-248, Title I, § 104(e), July 25, 2000, 114 Stat. 600, *with* Pub. L. 109-132, § 2(a), Dec. 20, 2005, 119 Stat. 2570. A negotiated sale did not materialize within the statutorily mandated period. Accordingly, Plaintiff condemned Defendants' outstanding geothermal interests; the stipulated date of taking is May 21, 2006. (Pl.'s Mot. 6.)

Plaintiff filed the underlying Complaint for Condemnation (Doc. 1) on October 2, 2006. At that time, Plaintiff deposited $700,000.00 - the amount it claims constitutes "just compensation" for Defendants' property - with the Clerk of Court. (Decl. of Taking ¶5; Notice of Clerk's Receipt 1; *cf.* Defs.' Mot. Ex. B (Letter from Craven of 12/18/01) (Forest Service offered Defendants $1.875 million for their mineral interests, pursuant to property appraisal).)

8

## II.     Fed. R. Civ. P. 71A.

Federal condemnation proceedings are "governed by Fed. R. Civ. P. 71A." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 3-4 (1984).  Pursuant to Rule 71A, "except for the single issue of just compensation, the trial judge decides all issues, legal and factual, that may be presented." *United States v. Reynolds*, 397 U.S. 14, 19-20 (1970) ("the sweeping language of [Rule 71A(h)'s] final sentence . . . discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial"); *United States v. Hardage*, 58 F.3d 569, 576 (10th Cir. 1995) ("[a]ny party to a condemnation proceeding is ordinarily entitled to a jury trial to fix the value of the property taken where demand is made as provided in Rule 71A(h)" (citations omitted)).  On this basis, this Court is authorized to entertain, and rule on, the preliminary determinations presented here.  *See United States v. Land, 62.50 Acres of Land*, 953 F.2d 886, 893 (5th Cir. 1992).

## III.    Discussion.

The Fifth Amendment requires Plaintiff to pay "just compensation" for "taking" Defendants' "private property."  U.S. Const. amend. V.  "[F]air market value [is] the measure of just compensation." *United States v. 819.98 Acres of Land*, 78 F.3d 1468, 1471-72 (10th Cir. 1996).  While "the law is not wedded to any particular formula or method for determining fair market value," *id*. at 1471 (internal quotation marks and citation omitted), the "highest and most profitable use" of the property at issue must be used in the calculus.  *United States v. Consol. Mayflower Mines, Inc.*, 60 F.3d 1470, 1476 (10th Cir. 1995) (citations omitted)).  For present purposes, it is significant that certain *potential* uses of the property may constitute the "highest and most profitable use." *United States v. 2,560.00 Acres of Land*, 836 F.2d 498, 503-04 (10th Cir. 1998).  A potential use will only be considered in the fair market value calculus, however, if - on the date of taking -

the potential use was "*reasonably probable* in the *reasonably near future*."  *See Consol. Mayflower Mines, Inc.*, 60 F.3d at 1476, 1479.

Whether geothermal resource development of the undivided mineral estate beneath the Preserve was "reasonably probable in the reasonably near future" is, then, crucial to appraising Defendants' condemned interests.  The parties' respective motions ask this Court to make divergent preliminary determinations related to this issue.

Plaintiff's motion asks the Court to adjudge that, on May 21, 2006:

(1) any use of the federally-owned surface estate to develop the underlying geothermal resource was governed by federal law; and (2) while development of the geothermal resource was further governed by state law, the United States could not be bound by state law "forced pooling" order regarding geothermal development.[4]

(Pl.'s Mot. 2.)  Defendants oppose the motion, responding that: (1) the VCPA preserved their interests as they existed when Plaintiff acquired Baca Ranch; and (2) regardless of whether Plaintiff is exempted from "forced pooling," the Fifth Amendment requires that they receive just compensation for their "right to recover supervision and risk charges" afforded them under New Mexico law.  (Defs.' Resp. 10, 17.)

Defendants' motion, conversely, seeks an order of this Court that:

(1) Defendants' development of the mineral estate was not governed by federal law and (2) Defendants are entitled to just compensation for supervisory and risk charges under New Mexico's Geothermal Resource Conservation Act.

(Defs.' Mot. 25.)  Interestingly, Defendants also argue that the instant condemnation of their property was within the scope of the Baca Ranch acquisition and, hence, any reduction in value affected by that project must be accounted for in calculating just compensation.  (*See id*. at 13-15.)

---

[4]In its Reply, Plaintiff "withdr[ew] its arguments that this Court should consider Judge Vázquez's prior rulings" in *GeoProducts of N.M., Inc. v. Valles Caldera Trust*, No. CIV 05-0394.  (Pl.'s Reply 4 n.1; *compare id*., *with* Pl.'s Mot. at 11-16.)

Plaintiff opposes Defendants' motion.  (Pl.'s Resp. 1 (stating further that Defendants' motion is "redundan[t]" in that it addresses "the very same legal issue[s]" raised by Plaintiff's pending motion).)

These issues and related arguments are taken up in turn.

## A.    Defendants' mineral estate was subject to federal regulation on the date of taking.

As noted above, the parties contest whether federal law - specifically, the Forest Service's special use regulations - governed Defendants' mineral interests on the date of taking.  For the reasons that follow, it is clear that it did.

Defendants maintain that, on the date of taking, state law alone governed their mineral estate. *Kleppe v. New Mexico*, 426 U.S. 529, 543 (1976).  Specifically, they underscore that New Mexico common law considers geothermal resources to be mineral interests, *see* N.M. Stat. Ann. § 71-5-3 (1978), and that mineral estates are dominant to the surface estates they lie beneath.  *See Kysar v. Amoco Prod. Co.*, 93 P.3d 1272, 1278 (N.M. 2004).  Defendants recognize that these surface use rights are limited.  Namely, that mineral estates' "surface rights . . . must be exercised with due regard for the rights of the surface owner."  *Amoco Prod. Co. v. Carter Farms Co.*, 703 P.2d 894, 896 (N.M. 1985) (citations omitted); *e.g.*, *Kysar*, 93 P.3d at 1286 (declining to find that "mineral lessee's implied right of reasonable surface usage within a production unit extends to land outside the unit as a matter of law").  But Defendants maintain that mineral estate owners and lessees are, nevertheless, "entitled to use as much of the surface area as is reasonably necessary" to develop and produce minerals.  *Carter Farms*, 703 P.2d at 896; *accord Kysar*, 93 P.3d at 1278 ("characteriz[ing] the implied right of the lessee to which *Carter Farms* refers as an implied easement by necessity" (citation omitted)).

Additionally, Defendants note that the New Mexico Geothermal Resource Conservation Act ("GRCA"), N.M. Stat. Ann. §§ 71-5-1–17-5-24 (Mitchie 2006), governs all geothermal resource development in the state.  N.M. Stat. Ann. § 17-5-2.A.  The GRCA vests the New Mexico Oil Conservation Commission ("NMOCC") with jurisdiction to regulate, *inter alia*, the allocation of geothermal production.  *Id*. § 71-5-10.  Therein, the NMOCC is authorized, under certain circumstances, to order "forced pooling" of undivided geothermal interests that are separately owned.  *See id*. § 71-5-11.C. (forced pooling may be appropriate to, e.g., prevent waste or "to avoid the drilling of unnecessary wells").  Further, the GRCA incentivizes geothermal development: it authorizes the NMOCC to allow owners who pursue development to collect a charge for their risk from non-consenting owners.  *Id*.  These "risk charges" can total up to 200% "of the nonconsenting owner's . . . pro rata share of the cost of drilling and completing the well."  *Id*.; (*see also* Defs.' Ex. D (Carr Aff. ¶1)).  Defendants argue that they enjoyed these state-law rights - especially, the right to reasonable use of the Preserve's surface and to risk charges - on the date of taking.

While New Mexico "undoubtedly retains jurisdiction over federal lands within its territory": "Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." *California Coastal Comm'n v. Granite Rock*, 480 U.S. 572, 581 (1987).  The question, then, is whether federal law, in addition to New Mexico law, governed Defendants' mineral estate.  The Court is convinced, for the following reasons, that the answer is yes.  First, on the date of taking, 87.5% of the undivided mineral estate, and 100% of the Preserve's surface estate was federally owned.  Further, Defendants' property was entirely encompassed by federally-owned lands.  As a result, federal regulations generally applicable to National Forest System lands clearly affected Defendants' ability to exercise its property rights to

12

the extent it involved using the Preserve's surface.  Second, the VCPA did not foreclose, but envisioned, such regulation.

**1.      The Forest Service had authority to reasonably regulate Defendants' use of the federally-owned Valles Caldera National Preserve surface estate.**

The Property Clause vests Congress with "the authority and responsibility to manage federal lands."  *United States v. Jenks*, 129 F.3d 1348, 1354 (10th Cir. 1997) (citing U.S. Const. art. IV, § 3); *accord Kleppe*, 426 U.S. at 539 ("[W]hile the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that the power over the public land thus entrusted to Congress is without limitations." (internal brackets, quotation marks, and citations omitted)).  "Indeed, Congress may regulate conduct occurring on or off federal land which *affects* federal land."  *Duncan Energy Co. v. U.S. Forest Serv.*, 50 F.3d 584, 589 (8th Cir. 1995) (emphasis added) (citing, *inter alia*, *Kleppe*, 426 U.S. at 539 (1976)).

"By statute, Congress has delegated this authority to agencies . . . who are obligated to oversee the management of national forest lands and protect the natural resources found therein." *See United States v. Jencks*, 22 F.3d 1513, 1517 (10th Cir. 1994).  In the case of lands within the National Forest System, Congress delegated authority to the Secretary of Agriculture and the United States Forest Service ("the Forest Service").

The Forest Service has a challenging mandate: it must "protect national forest interests," while also balancing and recognizing "the interests of inholders seeking access to property surrounded by forest service land."  *See id*.  "As a means of assuring and regulating access to inholdings," the Forest Service promulgated regulations: "[that] set forth a permit system designed to document 'the occupancy and use authorized on National Forest System lands or facilities and identify[ ] the landowner's rights, privileges, responsibilities, and obligations.'"  *Jenks*, 22 F.3d at

13

1517-18 (quoting 36 C.F.R. § 251.110(d)) (additional citations omitted) (rejecting facial challenge to the regulations, finding that they "constitute an unreasonable regulation of . . . patent or common law rights" to land).  This permit system - known as the Forest Service's "special-use regulations" - designates "[a]ll uses of National Forest System land . . . 'special uses.'" 36 C.F.R. § 251.50(a). Before any special use may be undertaken, "individuals or entities must": (1) "submit a proposal to the authorized officer"; and (2) obtain a special-use permit "from the authorized officer." *Id.*

Thus, the agency is authorized "to regulate surface access to outstanding mineral rights" within the National Forest System. *See Duncan Energy*, 50 F.3d at 589; *see also S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 740, 745 (10th Cir. 2005) (Congress's ability to regulate federal lands extends to governing "'their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them.'" (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917)).  The Valles Caldera National Preserve, as noted above, is part of that System.  As such, any "special use" of the Preserve must comply with the special-use permitting scheme.  The Forest Service's statutory obligation to manage and protect lands within the National Forest Service authorizes and requires it to insist on compliance with its special-use permit scheme where individuals seek to use or enter National Forest System land. *See, e.g.*, *United States v. Jenks*, 22 F.3d at 1518 (Forest Service special use permit requirement applied to owner of easement over Forest Service land) .

Additionally, Congress, in any event,  "retains the power to enact legislation respecting those lands pursuant the Property Clause." *Kleppe*, 426 U.S. at 543.  Because Congress enacted the VCPA pursuant to that provision, "the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause."  *Id*.  Thus, to the extent that New Mexico law is interpreted as entitling Defendants to unrestricted use of the Preserve's surface estate on the date of taking, it is inconsistent

14

with the Forest Service's special-use regulations. Necessarily, then, it "must recede." *Id.* Permitting unfettered access to the Preserve's surface would contravene Congress's purposes in passing the VCPA - i.e., "preserv[ing] and protect[ing]" the Preserve's diverse "values" while also ensuring "multiple use and sustained yield of renewable resources within the Preserve." 16 U.S.C. § 698v-3(b). Federal law, including the Forest Service's special-use regulations, applied to any efforts to develop the geothermal resource owned by Defendants on the date of taking.

Undoubtedly, the question presented here - i.e., whether, on the date of taking, Defendants' geothermal resource development efforts had to comply with the Forest Service special-use regulations - is res novo. Nevertheless, it is significant that two federal courts - faced with cases factually and legally analogous to the instant matter - reached the same conclusion that this Court reaches here. That is, both courts found that federal law governed the development of privately-owned subsurface minerals that were situated below federally-owned surface land.

In *Duncan Energy Company v. U.S. Forest Service*, the Court of Appeals for the Eighth Circuit held that a privately owned mineral estate, lying beneath the Little Missouri National Grasslands area - part of the Custer National Forest and, thus, the National Forest System - was subject to the Forest Service special-use regulations. *See Duncan Energy*, 50 F.3d at 585. The mineral estate at issue in *Duncan* was:

> originally patented . . . to Northern Pacific Railroad Company . . . . In 1916, the railroad deeded the land to various farmers, reserving "all minerals of any nature whatsoever ... together with the use of such of the surface as may be necessary for . . . mining . . . . In 1937, the United States acquired the surface estate pursuant to the Bankhead-Jones Farm Tenant Act, *subject to* the mineral reservation in the 1916 deed. Meridian eventually acquired the mineral rights and Meridian executed an oil and gas exploration agreement with Duncan on September 30, 1992.

*Id.* at 585 n.1 (emphasis added).

Duncan submitted a completed surface use plan to the Forest Service in anticipation of oil

drilling.  *See id.* at 595.  When the agency failed to act on the plan for several months, however, Duncan entered the land, constructed an access road, installed a drill rig, and sued the Forest Service.  *See id.* at 586-87 (Duncan's "contract with Meridian required it to drill seven wells within one year or incur liquidated damages"); *see also id.* at 585-86 (the agency had previously agreed to "process a [complete] surface use plan within ten working days of receipt").

The district court entered "a declaratory judgment that the [Forest] Service could not prohibit access to or regulate the exploration and development of the privately owned oil and gas estate." *Id.* at 587.  It reasoned that, under North Dakota law, "the mineral estate is the dominant estate and that the surface estate was. . . subservient" and, therefore, that the Forest Service's "attempt to prohibit the development of mineral interests" constituted "an inverse condemnation of the mineral estate." *See id.*

The Eighth Circuit reversed.  *Id.* at 588.  First, the appellate court noted that the mineral interest owners' rights under North Dakota law were limited to "the 'reasonable use' of the surface." *Id.*  Second, the *Duncan* court recognized that: (1) the Property Clause granted Congress broad authority "to regulate Forest System land"; (2) Congress had delegated significant power to the Forest Service "to regulate Forest System land"; and (3) the Forest Service's special use regulations authorized it to "regulate surface access to outstanding mineral rights." *Id.* at 589.  Accordingly, the court concluded that federal law governed Duncan's mineral estate and that the Forest Service was able "to regulate surface access to [Duncan's] outstanding mineral rights." *Id.*

In so holding, the Eighth Circuit underscored that "the special use regulations do not give the Forest Service 'veto authority' over mineral development":

> The Forest Service recognizes that it cannot *prevent* Duncan, as the owner of the dominant mineral estate, from exploring for or developing its minerals . . . . The [agency] argues that it is not prohibiting access to non-federal lands or diminishing

> Duncan's rights, but only regulating the use of the federal surface . . . . [Nor is] [t]he Forest Service . . . challenging Duncan's 'existing valid right' to conduct drilling operations.
>
> . . . .
>
> . . . For these reasons, we are convinced that the Forest Service has the limited authority it seeks here; that is, the authority to determine the reasonable use of the federal surface.

*Id*. at 589-91 (emphasis added) (internal brackets omitted).  The *Duncan* court also made clear that to the extent North Dakota law was "read to allow developers unrestricted access" to the surface and without affording "injunctive relief for the surface owner," it was "inconsistent with the special use regulations" and preempted.  *Id*. at 591 (finding, in the alternative, that state law would be inapplicable under "choice-of-law principles").

In *Dunn McCampbell Royalty Interest v. National Park Service*, the District Court for the Southern District of Texas held that federal law applied to a privately-owned mineral estate beneath the Padre Island National Seashore, a national park.  *Dunn McCampbell Royalty Interest v. Nat'l Park Serv.*, 964 F. Supp. 1125, 1128, 1138-39 (S.D. Tex. 1995).  The *Dunn McCampbell* plaintiffs' mineral estate had been privately owned since 1926.  In 1962, Congress established the Padre Island National Seashore and acquired property that included the surface situated above the plaintiffs' subsurface property.  In 1979, the Secretary of the Interior enacted the so-called 9B Regulations. *Id*. at 1129.  The 9B Regulations, akin to the Forest Service's special-use regulation, require all "non-federally owned oil and gas operations in all National Park System units" to obtain a permit prior to entering "on or through federally owned or controlled lands or waters."  *See id*.

The *Dunn McCambell* plaintiffs sued the National Park Service ("the Park Service") for declaratory relief.  *See id*.  Specifically, they sought a declaratory judgment that recognized: (1) the Park Service lacked the "constitutional power and/or authority to regulate access to their mineral estate" and that, instead, Texas law alone governed; and, alternatively (2) if the 9B Regulations

applied, they effected a taking that, in turn, entitled the plaintiffs to just compensation.  *See id*.

The court found for the government.  Holding that the case was time-barred, the *Dunn McCampbell* court found in the alternative that the plaintiffs' claims "fail[ed] as a matter of law." It concluded that the Park Service possessed "both the power and the authority to reasonably regulate the plaintiff's access to their mineral estate."  *Id*. at 1133, 1136.  The court emphasized that Congress, pursuant to the Property Clause, had delegated broad authority to the Park Service to regulate national parks and that Congress had not "preclude[d] federal regulation of their mineral estate" in establishing the Padre Island National Seashore.[5]  *Id*.  Accordingly, the *Dunn McCampbell* court ruled that the Supremacy Clause dictated that, to the extent a conflict existed, federal law trumped conflicting Texas law.  *Id*. at 1138-39.

*Duncan* and *Dunn McCampbell*'s reasoning is entirely consistent with the Court's conclusion that the Forest Service is authorized to reasonably regulate Defendants' mineral interests.  It is significant that in both those cases, as in the instant matter: (1) federal regulations were found to govern privately-owned, mineral estates surrounded by federal lands; (2) the mineral interests at issue were, and remained, privately owned long before the government acquired ownership of the surface estate and  state law recognizing the dominance of mineral estates was - to the extent it conflicted with federal regulations - trumped by federal law derived from Congress's Property Clause authority.  Indeed, if anything, the case for federal regulation is stronger here than in *Duncan*

---

[5]The provision at issue in *Dunn McCampbell* states that:

"Any acquisition hereunder shall exclude and shall not diminish any right of occupation or use of the surface under grants, leases, or easements, existing on April 11, 1961, which are reasonably necessary for the exploration, development, production, storing, processing, or transporting of oil and gas minerals that are removed *from outside the boundaries* of the national seashore . . . ."

*Id*. (quoting 16 U.S.C. § 459d-3(b)).  The plaintiffs argued that their property - because it was a subsurface estate - was "outside the boundaries" of the park.  The district court disagreed; the plaintiffs' estate was not "exempt from application of the 9B Regulations."  *Id*. at 1135.

or *Dunn McCampbell* by virtue of Plaintiff's co-tenancy with Defendants' on the date of taking.

Nevertheless, Defendants argue that *Duncan* and *Dunn McCampbell* are distinguishable from the instant matter:

> Congress' intent in passing the VCPA and preserving Defendants' rights is dispositively different from the Congressional intent manifested in the laws at issue in *Duncan* and *Dunn McCampbell*. Unlike the BFTA or the Padre Enabling Act by failing to make any provision for the fee mineral interest where Congress permitted federal regulation of mineral development on the surface estate, in this case Congress clearly intended that the VCPA would neither impose federal standards on the Defendants nor allow regulation of their development of the mineral estate . . . . Congress and the executive branch intended and expressly stated that the VCPA would preserve, rather than burden or diminish, Defendant's rights, the government cannot now claim an *ex post facto* and contradictory right of regulation.

(Defs.' Resp. 12.)  As explained below, however, the VCPA did not, and was not intended to, exempt Defendants' minority mineral interests from federal regulation.  *See infra* Part III.A.2.  As such, Defendants' efforts to distinguish these cases are unpersuasive.  This Court - like the *Duncan* and *Dunn McCampbell* - finds that federal regulations clearly applied to Defendants' mineral estate and, therein, any geothermal resource development efforts they undertook.[6]

> ### 2.    The VCPA did not exempt Defendants' mineral interests from federal regulation.

Congress's broad authority to regulate federal lands necessarily empowers it to *decline* "to exercise this power."  *Kirkpatrick  Oil & Gas Co. v. United States*, 675 F.2d 1122, 1124 (10th Cir. 1982).  Defendants contend that this is precisely what Congress did in enacting the VCPA.  That is,

---

[6]The Court recognizes that: (1) the Trust directed GeoProducts to submit its surface use plan to the Forest Service; (2) the Forest Service declined to approve or deny the plan, citing its "advisory role" in the process; and (3) at the same time, the Trust expressly opposed Defendants' development efforts.  *See supra* Part I.D.  To the extent the Trust argued it had "veto authority" to prohibit any and all geothermal-resource development of the Defendants' subsurface estate, this distinguishes this case from *Duncan* and *Dunn McCampbell*.  *Cf. Duncan Energy Co.*, 50 F.3d at 584, 589-91 ("The [Forest Service] argues that it is not prohibiting access to non-federal lands or diminishing Duncan's rights, but only regulating the use of the federal surface.").  But the Court does not understand this to be Plaintiff's argument here.  Accordingly, at this juncture, the Court concludes that the Forest Service's special-use permitting regime applied to Defendants' interests.  To the extent Defendants maintain that this determination affects a taking of their private property, these arguments are taken up below.  *Cf. infra* Part II.C. (addressing whether the application of the special-use permitting regulations effected a taking of Defendant's property).

that the Act exempted their mineral interests from otherwise applicable federal regulations. Defendants maintain, therefore, that obtaining a Forest Service special-use permit was not a prerequisite to geothermal development of the subsurface estate.  As discussed below, however, the Act's text, purposes, as well as its legislative history, evidence the contrary.  Indeed, the VCPA was clearly enacted to enable the Trust and the Forest Service to oversee and manage the Preserve's natural qualitites and resources.  *See* 16 U.S.C. § § 698v-3(b).

"In construing a federal statute, [this Court must] 'give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.'"  *United States v. Hess*, 194 F.3d 1164, 1170 (10th Cir. 1999) (quoting *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993)).  "'It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *In re Kunz*, No. 06-4014, 2007 WL 1600429, at *4 (10th Cir. June 5, 2007) (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)).

"'Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'"  *Id*. (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)).  Indeed, Congress is presumed to have intended "courts to apply the plain language of [a] statute unless such interpretation would lead to an absurd result."  *Id*. (citation omitted); *see generally Amoco Prod. Co. v. So. Ute Indian Tribe*, 526 U.S. 865, 873 ("In interpreting statutory mineral reservations like the one at issue here, we have emphasized that *Congress was dealing with a practical subject in a practical way* and that it intended the terms of the reservation *to be understood in their ordinary and popular sense*." (emphasis added) (internal quotation marks and citations omitted)).

20

As noted above, in proscribing Baca Ranch acquisition, the VCPA expressly addressed the "outstanding mineral interests" this way:

> (1) In general
> The acquisition of the Baca ranch by the Secretary shall be *subject to* all outstanding valid existing mineral interests.
>
> (2) Acquisition
> The Secretary is authorized and directed to negotiate with the owners of any fractional interest in the subsurface estate for the acquisition of such fractional interest for not to exceed its fair market value, as determined by appraisal done in conformity with the Uniform Appraisal Standards for Federal Land Acquisitions.
> . . .
> (5) Declaration of taking
>     (A) In general
>     If negotiations to acquire the interests are unsuccessful by the date that is 60 days after December 20, 2005, the Secretary shall acquire the interests pursuant to section 3114 of Title 40 . . . .[7]

16 U.S.C. § 698v-2(e) (2005) (emphasis added).  The meaning of § 698v-2(e)'s phrase "subject to" is central to Defendants' position that Congress expressly exempted their interests from federal regulation.

The VCPA itself does not define the phrase, "subject to."  *See id*. § 698v-1.  As such, "the plain meaning of the words" is key.  *In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005).  The word "subject" - when used as an adjective - is defined as:

> 1 a: falling under or submitting to the power or dominion of another . . . a: owing allegiance to or being a subject of a particular sovereign or state . . . . b: subjected c: obedient, submissive . . . . 2a: suffering a particular liability or exposure . . . b: prone, disposed . . . 3 *archaic*: situated under or below: subjacent 4: likely to be conditioned, affected, or modified in some indicated way: having a contingent relation to something and usu. dependent on such relation for final form, validity, or significance.

---

[7]Notably, § 698v-2(e)(1)'s language remained unchanged following the VCPA amendments of 2005. *Compare* Pub. L. 106-248, Title I, § 104(e), 14 Stat. 600 (July 25, 2000) ("subject to"), *with* Pub. L. 109-132, § 2(a), 119 Stat. 2570 (Dec. 20, 2005) (amending § 698v-2(e) to allow for taking, but leaving "subject to" language unchanged).

Webster's Third New International Dictionary, Unabridged 2275 (1971 ed.).  Pivotal to the meaning of the VCPA's words "subject to," therefore, is that the noun modified by the phrase - here, Plaintiff's "acquisition of the Baca ranch" - is subordinate to the predicate - here, "all outstanding valid existing mineral interests."  *See* 16 U.S.C. §§ 698v-2(e), 698v-3(e).

Applying the ordinary meaning of "subject to" in context, the phrase does not connote any meaning regarding whether federal regulations applied to the outstanding mineral interests.[8]  *See In re Kunz*, 2007 WL 1600429, at *4.  To the contrary, read in context and in a commonsense manner, it is clear that § 698-v2(e)'s directive simply sought to clarify that Plaintiff's acquisition of Baca Ranch did not include Defendants' mineral interests.  *Accord Burgess Const. Co. v. M. Morrin & Son Co., Inc.*, 526 F.2d 108, 113 (10th Cir. 1975) (citing 17 Am. Jur. 2d Contracts § 320 (1964)) ("The words 'subject to' usually indicate a condition to one party's duty of performance and not a promise by the other."); *Shell Oil Co. v. Manley Oil Corp.*, 124 F.2d 714, 716 (7th Cir. 1941) ("'The words 'subject to,' used in their ordinary sense, mean 'subordinate to,' 'subservient to' or 'limited by.'  There is nothing in the use of the words 'subject to,' in their ordinary use, which would even hint at the creation of affirmative rights.'" (quoting *Englestein v. Mintz*, 177 N.E. 746, 752 (Ill. 1931)); *Texaco, Inc. v. Pigott*, 235 F. Supp. 458, 463 (S.D. Miss. 1964) (construing real property deed made "subject to" extant oil and gas lease: "The words 'subject to' mean 'subservient to' or 'limited by' . . . . [and] are words of qualification showing the grantor's intent not to grant an absolute title."); *see generally* 26A C.J.S. *Deeds* § 279 ("[A]n exception excludes from the operation of the grant some existing portion of the estate or parcel granted which would otherwise pass under

---

[8]To the extent that Defendants argue that the "valid existing rights" recognized and safeguarded by the VCPA included the "right" not to be required to comply with the Forest Service's special-use permit, they do so unpersuasively.  Defendants cite no authority for the premise that their "bundle of sticks" attendant to owning their mineral interests include this right.

the general description of the deed. . . .  [it] take[s] something out of the thing granted that would

otherwise pass."). *C.f. County of Okanogan v. Nat'l Marine Fisheries Serv.*, 347 F.3d 1081, 1086

(9th Cir. 2003) (construing the Federal Land Policy and Management Act's language that "all

actions by the Secretary concerned under this Act shall be *subject to valid existing rights*" as a

"savings clause" that barred the government from "divest[ing] a private party of an existing 'land

use right' or other 'valid existing rights,'" but noting that the rights-of-way at issue "were always,

by their written terms, revocable at the discretion of the federal government" (emphasis added)).

Further, this ordinary understanding of the words "subject to" is entirely consistent with the

VCPA's "overall statutory scheme." *In re Kunz*, No. 06-4014, 2007 WL 1600429, at *4; *accord*

*Wyoming v. United States*, 279 F.3d 1214, 1230 (10th Cir. 2002) ("We must not be guided [in

construing a statute] by a single sentence or member of a sentence, but look to the provisions of the

whole law."); *High Country Citizens Alliance v. Clarke*, 454 F.3d 1177, 1191 (10th Cir. 2006)

(finding the "statutory scheme as a whole" material to discerning congressional intent).  In other

words,  read as a whole, the VCPA's text demonstrates that Congress intended the Preserve and its

resources to be managed pursuant to generally applicable federal regulations.

For instance,  the VCPA established the Preserve as "a unit of the National Forest System"

and provides that "all laws pertaining to the National Forest System" - including the Forest Service's

special use regulations - apply to resource management on the Preserve.  16 U.S.C. §§ 698v-3, 698v-

6(f); *e.g.*, 36 C.F.R. § 251.50(a) (Forest Service "special-use" regulations).  Additionally, the VCPA

directs the Secretary of Agriculture and the Trust to "develop a *comprehensive* program for the

management of lands, resources, and facilities within the Preserve to carry out the purposes under

[16 U.S.C. §] 698v-3(b)."  *Id.* § 698v-6(d) (emphasis added).  Notably, § 698v-3(b) provides that:

The purposes for which the Preserve is established are to protect and preserve the

23

scientific, scenic, geologic, watershed, fish, wildlife, historic, cultural, and recreational values of the Preserve, and to provide for multiple use and sustained yield of renewable resources within the Preserve, consistent with sections 698v to 698v-10 of this title.

*Id*. § 698v-3(b); *see also id*. § 698v-1(5) (defining "multiple use" by reference to 16 U.S.C. § 531);

16 U.S.C. § 531 ("'Multiple use' means: The management of all the various renewable *surface* resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; make[] the most judicious use of the land for some or all of these resources . . . and [that will facilitate] harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.").

These aims indicate Congress - in enacting the VCPA and creating the Trust to oversee the Preserve - intended the Preserve to be administered under a coordinated, unified federal management scheme:

the unique nature of the Valles Caldera and the potential uses of its resources with different resulting impacts warrants a management regime uniquely capable of developing an operational program for appropriate preservation and development of the land and resources of the Baca ranch in the interest of the public.

*Id*. § 698v(a)(11).

In addition, finding as Defendants urge - that federal law did not apply to the "outstanding mineral interests" - would effect an absurd result. It would mean that neither the Forest Service nor the Trust could manage Defendants' "reasonable" uses - as defined under state law - of the Preserve's surface. In other words, Defendants would have this Court believe that Congress intended to exempt their interests from federal regulation, absent clear language to that affect, even though: (1) Plaintiff owns 100% of the Preserve's surface estate; (2) the Preserve is a unit of the

National Forest System and is surrounded by federal lands; (3) the mineral subsurface estate is undivided; and (4) Plaintiff owned 87.5% of that estate on the date of taking. Such an interpretation is simply irreconcilable with the VCPA's text and stated aims.

Because § 698v-2(e)'s text, given the words' meaning and read in context, demonstrates that Congress did not intend to exempt Defendants' mineral estate from federal regulation, this Court "need not proceed further to determine Congress's intent." *Hackwell*, 2007 WL 1935621, at *7. It is, nonetheless, noteworthy that the VCPA's legislative history is consistent with the Court's interpretation of the Act - i.e., that the VCPA's "subject to" language simply clarified that the Baca Ranch acquisition did not include Defendants' mineral interests and did not exempt those interests from federal regulation. *E.g.*, S. Rep. No. 106-267, at 17-18 (2000) ("Section-by-Section Analysis"); *see also, e.g.*, *Valles Caldera Acquisition: Hearing on H.R. 3288 Before the H. Comm. on Resources*, 106th Congress, *available at* 2000 WL 620981 (2000) (statement of James R. Lyons, Dep't of Agric., Under Sec'y for Natural Res.) ("[T]he acquisition of the Baca Ranch by the Forest Service in no way limits the property rights of these owners - they remain the same both before and after acquisition.").[9] Indeed, the Act's legislative history reveals that Defendants recognized that federal regulation would apply to their interests after the VCPA's enactment. *New Mexico Ranch*

_____

[9]Notwithstanding Defendants' position, the Senate Report's "Regulatory Impact Evaluation" is not to the contrary. That portion of the Report - mandated pursuant to "paragraph 11(b) of rule XXVI of the Standing Rules of the Senate" - states that: "The bill is not a regulatory measure in the sense of imposing Government-established standards or significant economic responsibilities on private individuals and businesses." *Id.* at *26. Defendants argue that this indicates that Congress intended Defendants - as private individuals - to be exempt from federal regulation under the VCPA. This understanding is unpersuasive. The provision is better understood to mean that the VCPA did not establish a wide-reaching regulatory scheme such as that attendant to the Endangered Species Act. *Compare id.*, *with P.L. 93-205*, *Endangered Species Act of 1973*, S. Rep. 93-307 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2989, 2995-96(explaining that the ESA authorized the Secretary of the Interior to "list species as endangered or threatened" and "requires the Secretary . . . to issue regulations to protect that species" and, therein, "may make any or all of the acts and conduct defined as 'prohibited acts'" unlawful), *and id.* at 2998 (defining "prohibited acts" to include "importing, exporting, taking, selling, distributing, or offering for sale in the United States any endangered species").

*Acquisition: Hearing on S. 1862 Before the S. Subcomm. on Forests and Public Lands Management*, 106th Cong. (2000) (statement of Gregory J. Nibert, of Hinkle, Cox, Eaton, Coffield & Hensley, L.L.P., on behalf of the Harrells) ("Once the United States acquires title it brings with it an entire administrative system and bureaucracy which complicates the co-owner's ability to use and enjoy the corm-non estate. Even if the United States was acquiring the Dunigans interest for purposes of developing the geothermal resources, the Harrells estate would change.").

For these reasons, it is clear that the VCPA did not exempt Defendants' property from otherwise applicable federal regulation. On the date of taking, therefore, Defendants' mineral interests were governed by federal law. As such, obtaining a special-use permit from the Forest Service was a necessary prerequisite to any development of the undivided mineral estate.

> **3.      Defendants' mineral interests were within the "scope" of the Valles Caldera National Preserve "project"; the "scope of the project" rule applies.**

Defendants argue that their property was within the "scope" of Plaintiff's Valles Caldera National Preserve "project" from the time the Baca Ranch acquisition was authorized by the VCPA of 2000. They contend, therefore, that the "scope of the project" rule applies. Plaintiff counters that this position is "fundamentally flawed": given that Plaintiff was not "committed to" acquire Defendants' interests until the VCPA of 2005 was enacted, the rule is inapplicable. (Pl.'s Resp. 14.) Defendants' position is persuasive.

The genesis of the "scope of the project rule" ("SOP rule") is closely tied to the fact that: "It is axiomatic that a landowner is entitled to compensation that will place him in as good a position as he would have occupied had his land not been taken." *U.S. v. 2,560.00 Acres of Land*, 836 F.2d at 498 (citing *United States v. Miller*, 317 U.S. 369, 373 (1943)). As such, "to permit compensation to be either reduced or increased because of an alteration in market value attributable to the

[government's] project itself would not lead to the 'just compensation' that the Constitution

requires." *United States v. Reynolds*, 397 U.S. at 16 (citations omitted).

As the Tenth Circuit has succinctly explained:

In *United States v. Miller*, 317 U.S. 369, 377 (1943), the Supreme Court established the test for when the government must pay enhanced value:

"The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it.  If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement.  If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned.  The owners ought not to gain by speculating on probable increase in value due to the Government's activities."

In *United States v. Reynolds*, 397 U.S. 14, 21 (1970), the Court added that the test "does not require a showing that the land ultimately taken was actually specified in the original plans for the project.  It need only be shown that during the planning or original construction it became evident that land so situated would *probably be needed* for the public use."

*Miller* and *Reynolds* reflect a policy of accommodating both the government's pursuit of the general welfare through public projects and private parties' interests in the development and marketability of lands near government projects.  If a landowner's property increases in value because of the government project, the government need not pay this enhanced value unless (1) the property was not within the original scope of the project; or (2) the government failed to provide the public with adequate notice of the project's scope; or (3) the landowner reasonably believed that subsequent government action removed the property from the project's scope.  If the landowner can prove any of these three situations exist, upon condemnation the government must pay the enhanced value.

*United States v. 49.01 Acres of Land*, 669 F.2d 1364, 1367 (10th Cir. 1982) (emphasis added)

(additional  citations omitted).  Clearly, the SOP rule applies "to [d]epreciations in value, as well

as enhancements, attributable to the Government project for which property is taken." *United States*

*v. 320.0 Acres of Land*, 605 F.2d 762,  787 n.32 (5th Cir. 1979) (citing *Reynolds*, 397 U.S. at 16);

*see also U.S. v. 2,560.00 Acres of Land*, 836 F.2d at 501.

Whether property at issue in "a second taking is within the scope of the original project for purposes of applying the rule of *United States v. Miller*, 317 U.S. 369 (1943), is to be answered essentially by determining the reasonable expectations of the ordinary landowner." *United States v. Eastman*, 714 F.2d 76, 77 (9th Cir. 1983) (per curiam). Indeed, the Tenth Circuit has expressly rejected a "narrow reading," or rigid application, of the SOP rule: "in considering whether land is within the original scope of the project, a court must be realistic and not compel the government to follow a precise time table for acquisition or to specify exactly which lands the project will require." *49.01 Acres of Land*, 669 F.2d at 1367-68 (citation omitted).

Here, it is clear that, following the VCPA of 2000's enactment, a reasonable landowner would think that Plaintiff's Preserve "project" would require acquisition of Defendants' 12.5% interest in the undivided  mineral estate.  Consideration of the VCPA of 2000's purposes, alone, requires this conclusion. *See, e.g.*, 16 U.S.C. § 698v-3 ("The purposes for which the Preserve is established are to protect and preserve the scientific, scenic, geologic, watershed, fish, wildlife, historic, cultural, and recreational values of the Preserve, and to provide for multiple use and sustained yield of renewable resources within the Preserve . . . ."). Geothermal resource development is simply incompatible with the Preserve's aims. Further, in outlining how Plaintiff was to acquire the lands that would become the Preserve, the VCPA of 2000 "authorized and directed" the federal government to "negotiate with the owners of any fractional interest in the subsurface estate for the acquisition of such fractional interest for not to exceed its fair market value . . . ." Pub. L. 106-248, Title I, § 104(e), 14 Stat. 600 (July 25, 2000). Defendants' property "was within the original scope of the project": When the VCPA of 2000 was enacted it was clear that Defendant's outstanding minority interests were needed to serve the Preserve's aims and, therefore,

would be acquired by Plaintiff at some point. *49.01 Acres of Land*, 669 F.2d at 1369.

The fact that the outstanding mineral interests were not actually acquired by Plaintiff until 2006 does not prescribe a contrary result. "Length of time between commencement of a project and condemnation of property may be a factor in determining reasonableness of a landowner's belief." *Id*. The six-year delay in this case would not have caused a reasonable landowner to believe that Defendants' property no longer was within the scope of the Preserve project. *Cf. 2,560.00 Acres of Land*, 836 F.2d at 501 (ten-year delay) (delay not such that would cause a reasonable landowner to think that "the government had abandoned acquisition of this property"); *United States v. 62.17 Acres of Land*, 538 F.2d 670, 680 (5th Cir. 1976) (six-year delay) (same); *United States v. 31.43 Acres of Land*, 547 F.2d 479, 481 (9th Cir. 1976) (four-year delay) (same). This is so, particularly, in light of the parties' willing-basis sale negotiations and extensive communications in the intervening years. (*E.g.*, Defs.' Mot. Exs. B, L, M, N; *see also, e.g.*, Pl.'s Resp. Exs. 4-7.) If nothing else, the record makes clear that geothermal resource development could not go forward "once the government's project commenced" in 2000. *2,560.00 Acres of Land*, 836 F.2d at 501. (*Compare* Defs.' Mot. Ex. S (Forest Service could not "deny or approve" GeoProducts' surface-use plan), *and* Defs.' Mot. Ex. N (Trust opposed GeoProducts' "efforts to attempt to use the existing well bores" on the Preserve), Pl.'s Resp. Ex. 7 ("[T]he Government does not intend to develop any of its mineral interests on the Preserve"), *with* Pl.'s Mot. Ex. 3 (NMOCC denied GeoProducts' APDs noting that the parties "agree that exploration can only begin" if the Forest Service issued a special-use permit).)

Thus, Defendants' property was within the scope of Plaintiff's Valles Caldera National Preserve project from the time of the first taking in 2000. The SOP rule applies: Defendants should be compensated for any diminution in valued caused by Plaintiff's Preserve project. *See United*

*States v. 320.0 Acres of Land*, 605 F.2d 762, 787 n.32 (5th Cir. 1979) ("'[I]t would be manifestly unjust to permit a public authority to depreciate property values by a threat . . . (of . . . a government project) and then to take advantage of this depression in the price which it must pay for the property when eventually condemned.'").

  **B.**  **Plaintiff is not subject to GRCA's "forced pooling" scheme; the Court need not reach whether Defendant is entitled to compensation for GRCA "supervision and risk charges."**

  The second preliminary determination the parties seek relates to whether Defendants had a right to receive supervisory and risk charges under New Mexico law on the date of taking. Plaintiff maintains that Defendants were not because the United States is not, and was not, subject to the GRCA's forced pooling scheme.

  In *Kirkpatrick Oil & Gas Co. v. United States*, the Tenth Circuit ruled that "a state communitization order may not bind federally owned land, or extend leases of such land within the unit, without the consent of the of the Secretary of Interior." *Kirkpatrick Oil & Gas Co. v. United States*, 675 F.2d at 1126. The *Kirkpatrick* plaintiffs held oil and gas leases on federal land, the terms of which conditioned extension beyond the initial ten-year term on production. *Id.* at 1123-23. Due to "lack of paying production" after the original lease period, the Secretary of the Interior terminated the plaintiffs' leases. *See id.*

  The plaintiffs appealed the agency decision, arguing that a state communitization order applied, such that oil production from its well situated within the unit, but on non-federally owned land, should be deemed "production from federal lands" for purposes of comporting with the federal lease and avoiding termination of the same. *Id.* at 1124. The Secretary had not consented to state-compelled communitzation. *See id.* at 1123-24. After the Interior Board of Land Appeals upheld the determination, the plaintiffs sued in federal district court. That court found, "on stipulated

facts," that "the leases had expired."  *Id*. at 1123.

The Tenth Circuit affirmed.  Interpreting the Mineral Lands Leasing Act of 1920, the *Kirkpatrick* court spoke in broad terms: "a state communitization order may not bind federally owned land, or extend leases of such land within the unit, without the consent of the Secretary of the Interior."  *Id*. at 1124.  It reached this holding by reasoning that:

> In a number of paragraphs [30 U.S.C. §] 226(j) delegates to the Secretary's discretion the power to approve, in order to promote conservation, modifications to federal mineral leases, unit or cooperative plans, and operating, drilling, or development contracts.  To be consistent with the rest of section 226(j), Congress must have intended that the Secretary have approval authority over any communitization of federal lands, and that no state-ordered forced pooling would bind the government without the Secretary's consent.
> This construction is supported by the Supreme Court's analytical approach that focuses on whether applying state law to an issue affecting a federal mineral lease poses a "significant threat to any identifiable federal policy or interest."  If compulsory state pooling orders were applied to federally owned lands over the Secretary's objection, a state could impose acreage requirements and unit boundaries that conflict with the Secretary's judgment of the best standards for conservation purposes.  If federal lessees are unable to secure the Secretary's approval for a voluntary communitization agreement, they should not be able to circumvent that requirement by obtaining a compulsory state pooling order.  Also, because production extending a federal lease in a communitized unit may come from a well drilled on nonfederal land, if state orders were to apply to federal lands without the Secretary's approval, it would interfere with the Secretary's control over its own lessees and lease provisions requiring, for example, the lessee to drill in different production zones or to produce at particular rates.

*Id*. at 1125-26 (citations and notes omitted).

True, *Kirkpatrick* differs factually from this case in that, one, Defendants did not lease, but rather owned, their minority interest in the undivided mineral estate and, two, that the court was construing the Mineral Leasing Act.  Its reasoning nevertheless applies with full force.

*Kirkpatrick* analyzed the applicability of state law forced-pooling rules in light of whether they posed a  "significant threat to any identifiable federal policy or interest."  *See id*.  First, *Kirkpatrick* found that "state-ordered forced pooling" that would "bind the government without the

[Secretary's] consent" was impermissible because it was inconsistent with the discretion afforded the Secretary of the Interior.  Like the significant discretion afforded the Forest Service in special-use permitting, the Secretary of the Interior enjoyed the power "to approve, in order to promote conservation, modifications to federal mineral leases, unit or cooperative plans, and operating, drilling, or development contracts."  *See id.*  As such, *Kirkpatrick*'s logic is on all-fours here: state-ordered forced pooling absent federal consent would be wholly inconsistent with the Forest Service's discretion to regulate special uses of the Preserve, a unit of the National Forest System. *See id.*          Second, as in *Kirkpatrick*, a finding that, regardless of Forest Service approval, a state-ordered  forced pooling order could govern would potentially "pose a 'significant threat to . . . identifiable federal policy or interest[s].'"  *See id.* at 1126 (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966))).  Third, it makes eminent sense that Defendants should not be allowed to "circumvent" the Forest Service's refusal to issue a requested special use permit "by obtaining a compulsory state pooling order."  *Id.* (citation omitted).

Finally, it is notable that both the NMOCC and Defendants have previously recognized that Plaintiff cannot be bound by an NMOCC forced-pooling order.  *E.g.*, Pl.'s Mot. Ex. 3 at 4 (NMOCC Order of 2/12/04) ("The Trust correctly points out that the federal mineral interest cannot be force pooled pursuant to state law without federal consent.");  *New Mexico Ranch Acquisition: Hearing on S. 1862 Before the S. Subcomm. on Forests and Public Lands Management*, 106th Cong. (2000) (statement of Gregory J. Nibert, of Hinkle, Cox, Eaton, Coffield & Hensley, L.L.P., on behalf of the Harrells) ("[U]nlike private parties, the Harrells would not be able to secure jurisdiction over the United States in a State of New Mexico administrative proceeding to force geothermal development.").

For all these reasons, the Court finds that, on the date of taking, Plaintiff was not subject to

the GCRA's "forced pooling" scheme.  To the extent Defendants maintain that this determination

effects a "taking," these arguments are taken up below.  *See infra* Part III.C.

> **C.      Whether the fact that the VCPA made Defendants' interests subject to federal regulation effected a "taking."**

As the Tenth Circuit recently explained:

> The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. It is clear from this text that governmental interference with private property rights is not limited per se. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314-15 (1987).  Rather, the Takings Clause is understood only to require compensation for a "proper interference amounting to a taking." *Id.* at 315 . . . .
>
> Generally, compensation for a taking may be obtained under the Tucker Act, which confers jurisdiction on the United States Court of Claims. 28 U.S.C. § 1491. Thus, if a Tucker Act remedy is available, plaintiffs *must* first avail themselves of the process provided by the Tucker Act and file suit in the Court of Claims for compensation.   A remedy is available under the Tucker Act unless Congress expresses an unambiguous intention to withdraw the Tucker Act remedy. The ESA contains no language to indicate a Congressional intention to withdraw a Tucker Act remedy. Accordingly, the Court of Claims retains jurisdiction over takings claims that arise under the ESA. *See id.*

*Gordon v. Norton*, 322 F.3d 1213, 1216-17 (10th Cir. 2003) (additional citations omitted).  Here,

the VCPA makes no reference to or otherwise indicates that Congress intended to "withdraw a

Tucker Act remedy."  *See id*. (Court of Claims retained jurisdiction over Environmental Species Act

takings claims) ("[T]he [Endangered Species Act] "contains no language to indicate a Congressional

intention to withdraw a Tucker Act remedy").  As such, to the extent Defendants argue that the

preliminary determinations issued by the Court today signal that the VCPA of 2000 effected a Fifth

Amendment taking, the Court of Claims enjoys exclusive jurisdiction to adjudicate these issues.[10]

---

[10]The record reflects that, to the extent Defendants raise such claims, they exceed $10,000.  (*Compare* Def.'s Mot. Ex. B (Letter from Jack L. Craven, Director of Lands, U.S. Forest Service, to J.B. Harrell, Jr. of 12/18/2001) (tendering a $1.875 million offer for Defendants' interests), *with* Decl. of Taking ¶5 (tendering $700,000.00 with the Clerk of Court, the amount Plaintiff claims constitutes "just compensation" for its "taking" of Defendants' property on May 21, 2006), *and* Notice of Clerk's Receipt 1 (same).)

*Accord Dunn McCampbell Royalty Interest*, 964 F. Supp. at 1138-39 (finding further that it lacked

jurisdiction  to adjudicate whether NPS's regulation of "Plaintiffs' mineral estate constiute[d] a

taking under the Fifth Amendment" because the Tucker Act "vests[s] subject matter jurisdiction

exclusively in the Court of Federal Claims" for takings in excess of $10,000).

**IV.**      **Conclusion.**

For all the forgoing reasons, Plaintiff's motion (Doc. 24) is **granted**, and Defendants' motion

(Doc.39) is **granted in part and denied in part**, as stated herein.

**IT IS SO ORDERED**.


_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**